# In the United States Court of Federal Claims

Nos. 20-120C & 20-150C (consolidated)
(Originally Filed: September 23, 2020)
(Re-issued: November 2, 2020)[1]

* * * * * * * * * * * * * * * * * * * * * * * * *

QUANTICO TACTICAL INC.,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant*,

and

ATLANTIC DIVING SUPPLY, INC.

*Intervenor-Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * * *

UNIFIRE, INC.,

    *Plaintiff,*

v.

THE UNITED STATES,

    *Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * * *

Pre-award bid protest; Competitive range determination; FAR 15.306; technically unacceptable; prejudice.

    *Anuj Vohra*, Washington, D.C., with whom was *Daniel R. Forman*, *Eric M. Ransom*, and *Rina M. Gashaw*, for plaintiff Quantico Tactical Inc.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of protected material. The parties have done so but disagree as to the extent of those redactions. Appropriate redactions appear in brackets below.

*David S. Black*, Tysons Corner, VA, for plaintiff Unifire, Inc. *Gregory R. Hallmark* and *Amy L. Fuentes* of counsel.

*Douglas T. Hoffman* and *Mariana T. Acevedo*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom was *Martin F. Hockey, Jr.*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, and *Ethan P. Davis*, Acting Assistant Attorney General, for defendant.

*Paul F. Khoury*, Washington, D.C., for intervenor. *John R. Prairie*, *Kendra P. Norwood*, and *J. Ryan Frazee* of counsel.

## **OPINION**

BRUGGINK, Judge.

In these consolidated bid protest actions, Quantico Tactical Inc. ("Quantico") and Unifire, Inc. ("Unifire") challenge their exclusion from the competitive range by the Defense Logistics Agency ("DLA") in a procurement for special operations equipment and logistical support. Pending before the court are plaintiffs' motions for judgment on the administrative record and the cross-motions of defendant and intervenor, Atlantic Diving Supply, Inc. ("ADS"). The motions are fully briefed, and oral argument was held on September 15, 2020. Because Quantico cannot show prejudice, its protest must be denied. Unifire's protest is denied because it has not shown irrationality in DLA's decision to exclude it from the competitive range.

### **BACKGROUND**

On November 16, 2018, DLA issued Request for Proposals ("RFP") No. SPE8EJ-18-R-0001 for the Special Operations Equipment ("SOE") Tailored Logistics Support ("TLS") Program. The RFP contemplated multiple awards for an indefinite-delivery/indefinite-quantity ("IDIQ") contract with a two-year base period and up to four two-year option periods (potential 10-year total). Under the SOE TLS program, contract holders will compete to supply special operations equipment to authorized Department of Defense customers. In addition, contractors will provide logistics support for the supplied equipment.

The RFP provides that DLA would engage in a best value tradeoff process to make "[a]wards . . . to offerors whose proposals are most advantageous to the Government considering non-price evaluation factors and price." Administrative Record ("AR") at 151. The two non-price

2

evaluation factors are: Factor I – Past Performance; and Factor II – Technical Merit. The Technical Merit Factor is broken into two subfactors: (a) Product Sourcing and (b) Distribution. Factor I is more important than Factor II and, within Factor II, (a) Product Sourcing is more important than (b) Distribution.  Non-price factors are "significantly more important than price," but, the importance of price would increase if the technical merits of proposals were equivalent.  *Id.*

The Past Performance Factor assesses "the offeror's probability of meeting the solicitation requirements." *Id.* at 151-52. Offerors were to submit up to three past performance references to allow DLA to evaluate their relevance. DLA would then assign a ranking based on each past performance reference of either "Very Relevant," "Relevant," "Somewhat Relevant," or "Not Relevant," along with a quality of contractor performance ranking of either "Outstanding," "Good," "Acceptable," "Marginal," or "Unacceptable." *Id.* at 145, 152. These assessments resulted in DLA assigning an overall "Confidence Assessment" of the contractor's ability to perform on the new contract—"Substantial Confidence," "Satisfactory Confidence," "Limited Confidence," "No Confidence," or "Neutral Confidence"—which DLA assigned "based on the offeror's record of relevancy and quality of performance." *Id.* at 152.

The Solicitation's Statement of Work ("SOW") contained several critical performance metrics that offerors' proposals would be measured against. Contractors are required to maintain a "quote rate" of 90%, meaning the contractor "must submit quotes on 90% of the Delivery Order RFQs." AR 130. Contractors must also maintain a 95% "fill rate," defined as the proportion of quantity ordered that the contractor actually delivers. *Id.* at 135. The contractor also must maintain a 90% "on-time delivery rate," defined as the proportion of quantity ordered that the contractor delivers on time. *Id.*

Under Factor II, Technical Merit, subfactor (a), Product Sourcing, DLA would assess an offeror's plan to meet certain RFP requirements, including:  (1) purchasing system requirements; (2) a 90 percent Quote Rate Performance Metric; and (3) a 95 percent Fill Rate Metric. Subfactor (b), Distribution, would assess an offeror's distribution plan for whether it could "meet the delivery requirements including, routine, urgent, emergency orders, and consolidated bill of material requirements and plan to meet the 90% on-time delivery metric and ensure control over subcontracting." *Id.* at 153. Under each subfactor, DLA promised to assign an overall adjectival rating of "Outstanding," "Good," "Acceptable," "Marginal," "Unacceptable" based on the strengths, deficiencies, weaknesses, and risks of the offeror's proposal. AR at 45-46 (acquisition plan).

3

The Source Selection Plan explained that these adjectival technical ratings "reflect[] the degree to which the proposal meets or does not meet the minimum requirements" for each subfactor. *Id.* at 43 (Product Sourcing), 44 (Distribution). An offeror's plan to meet the SOW's performance metrics was an important aspect of the ratings for each subfactor. *See id.* at 43-46. An unacceptable rating was defined as a "proposal [that] does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable." *Id.* at 44, 46. The solicitation warned that such a rating meant that the proposal was "unawardable." *Id.* A "weakness" was defined by DLA to mean a "flaw in the proposal that increases the risk of unsuccessful contract performance, while a "deficiency" meant that DLA found a "material failure of a proposal to meet a Government requirement." AR at 151. A deficiency was alternatively defined as a "combination of significant weaknesses." *Id.* Either of which would "increase the risk of unsuccessful contract performance to an unacceptable level." *Id.*

Quantico, Unifire, and 27 other vendors timely submitted offers by the deadline of January 18, 2019. [ ] of the [ ] offerors failed to meet the requirement to offer on 90 percent of the Price Evaluation List ("PEL") and were thus considered unresponsive. The remaining [ ] offerors were evaluated by the Source Selection Evaluation Board ("SSEB"), which began its non-price evaluation on January 31, 2019. The non-price evaluation was completed on June 14, 2019; the report details the results for the plaintiffs as detailed below.

I. Quantico

DLA rated Quantico as follows:

| Factor I Past Performance – Confidence Assessment | Factor II Technical Merit Subfactor (a) Product Sourcing | Factor II Technical Merit (b) Distribution | Total Evaluated Price |
|---|---|---|---|
| Satisfactory Confidence | Marginal | Unacceptable | $[            ] |

According to DLA's debriefing letter, under Factor I – Past Performance, DLA had "a reasonable expectation that Quantico [would] successfully perform the required effort." *Id.* at 4515. Under Factor II – Technical Merit, subfactor (a), Quantico's proposal received [

4

]. *Id.* Under subfactor (b), Quantico received [
]. *Id.*; *see also* AR at 3568-83 (SSEB Non-Price Evaluation Report).

II. Unifire

Unifire was evaluated as follows:

| Factor I Past Performance – Confidence Assessment | Factor II Technical Merit Subfactor (a) Product Sourcing | Factor II Technical Merit (b) Distribution | Total Evaluated Price |
|---|---|---|---|
| Satisfactory Confidence | Unacceptable | Good | $[          ] |

For Past Performance, Unifire was rated as Satisfactory Confidence, which means, like Quantico, DLA had a "reasonable expectation" that Unifire would successfully perform. For the technical subfactors, Unifire was rated having one strength and one deficiency for Product Sourcing. The deficiency was found due to a lack of a plan for how Unifire would meet the 95 percent fill rate metric and ensure control over subcontracting. For the Distribution subfactor, Unifire was found to have a strength and it was rated "Good" overall. AR at 4528-36 (Unifire's debriefing letter from DLA); *see also* AR at 3680-98 (SSEB Non-Price Evaluation Report).

Ultimately, DLA only selected [ ] offerors for inclusion in the Competitive Range: (1) ADS; [

]. On December 4, 2019, DLA informed both Quantico and Unifire in that they were being excluded from the competitive range. More detailed debriefing letters were requested and provided shortly thereafter.

III. Procedural History

On December 23, 2019, Quantico filed a protest before the Government Accountability Office ("GAO"). After GAO's denial of Quantico's request for documents, Quantico filed its complaint here on February 3, 2020. On January 6, 2020, Unifire filed a protest at GAO. GAO dismissed Unifire's protest after Quantico filed its protest here. Unifire filed here on February 13, 2020, and we consolidated the actions at the request of the parties on March 3, 2020. We also granted the request by ADS, an offeror

5

who was part of the competitive range, to intervene by separate order on that date.

Although the parties were then fully assembled, they presented several preliminary matters. On March 12, 2020, Quantico filed a motion to supplement the administrative record and for permission to take limited discovery relevant to asserted bias and fraud in the procurement on the part of DLA and ADS. On March 20, 2020, ADS filed a motion to disqualify plaintiff's counsel because it is had formerly represented intervenor in a related matter. The parties then completed briefing on those motions. We held oral argument on the motion to disqualify counsel on April 29, 2020, at the conclusion of which we announced that we would grant the motion because we agreed that the former representation of ADS concerned matters substantially related to the issues presented here. *See Quantico Tactical Inc. v. United States*, 148 Fed. Cl. 440 (2020) (explaining that counsel was disqualified for breaching duty of loyalty). We afforded plaintiff 30 days in which to substitute new counsel, which it did on May 11, 2020.

After affording new counsel time to get up to speed and an opportunity to amend its request to supplement the record, which it declined, we held argument on that motion on June 4, 2020, at the conclusion of which we announced that we would, except for two documents, deny the request. We issued a written opinion several days later. *Quantico Tactical Inc. v. United States*, No. 20-120C, 2020 WL 4197333 (Fed. Cl. July 17, 2020) (publication pending). The case was then set for disposition on the merits by cross-motions for judgment on the administrative record.

## DISCUSSION

The main thrust of Quantico's motion is that DLA's evaluation of its proposal under the Past Performance Factor was arbitrary because it measured Quantico against a standard that it did not apply to any other offeror, i.e., that it should have been rated higher. It also challenges the weakness it received for the Product Sourcing subfactor and [          ] deficiencies for the Distribution subfactor. It believes that, had any or all of the ratings, but particularly past performance, come out differently, it might have been kept in the competitive range.

Defendant and intervenor respond generally that plaintiff has not established any error in DLA's evaluation, but more importantly, they highlight the [          ] left unchallenged by Quantico for its Distribution rating, namely that Quantico[

                                       ]. They argue that Quantico cannot show

6

prejudice because its proposal was technically unacceptable and unawardable [                    ], irrespective of what the court might conclude with respect to the errors Quantico asserts.

Unifire argues that DLA's flawed evaluation of its proposal under technical subfactor (a), Product Sourcing, kept it out of the competitive range arbitrarily. It challenges DLA's assignment of a deficiency for failing to show how it will meet the 95 percent fill rate metric and alleges that it was treated unequally in this regard when compared to another offeror who it argues offered a similar plan but was found acceptable. Unifire also argues that it should have been awarded a strength for its plan to provide a narrative explanation to DLA whenever it could not source an item and submit a quote for it, which is relevant to the 90 percent quote rate requirement from the SOW for the Distribution subfactor. Unifire again points to another offeror that received a strength for offering to exceed the fill rate and to notify and explain when it could not source a compliant item. This, Unifire urges, is unequal treatment because, in substance, the two proposals offered the same service but only one, not the protestor, received a strength for it. The competitive range determination was thus based on flawed ratings and was not rational, according to Unifire.

Defendant disagrees, arguing that Unifire's challenges are nothing more than disagreements with government evaluators and are not the basis of a legitimate protest.[2] The government finds a substantive difference when comparing the proposals highlighted by Unifire and also argues that Unifire's reliance on material outside the particular section of its proposal dealing with the fill rate was improper. Defendant argues finally that Unifire has not established prejudice, even if we were to sustain its challenges, because there is no evidence it would have received a high enough rating to make the competitive range.

Under Court of Federal Claims Rule 52.1, we review agency procurement decisions to determine whether they are supported by the already-existing administrative record. *See, e.g., Lawrence Battelle, Inc. v. United States*, 117 Fed. Cl. 579, 585-86 (2014) (citing *Florida Power & Light v. Lorion,* 470 U.S. 729, 743 (1985) (stating "the focal point for judicial review should be the administrative record already in existence, not some record made initially in the reviewing court")). Rule 52.1 is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

---

[2] Intervenor did not respond to Unifire's motion for judgment on the administrative record.

The Court reviews the merits of an award decision under the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See* 28 U.S.C. § 1491(b)(4) (2012). The proper inquiry is whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Lawrence Battelle, Inc.*, 117 Fed. Cl. at 586 (citing 5 U.S.C. § 706(2)(A)). Under this standard, the court should set aside an agency decision if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement involved a violation of regulation or procedure." *Impresa Construzioni Geom. Demonico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Generally, this court gives great deference to an agency's decision in establishing the competitive range. *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 973 (Fed. Cir. 1993). Therefore, the protestor "bears a heavy burden" to demonstrate that the contracting offeror's determination lacked a rational basis as the agency "need only articulate 'a rational connection between the facts found and the choice made.'" *KSC Boss Alliance, LLC v. United States*, 142 Fed. Cl. 368, 380 (2019) (quoting *Impresa*, 238 F.3d at 1338)).

I. Quantico Has Not Established That It Was Prejudiced By DLA's Evaluation

The bulk of Quantico's briefing is focused on its Past Performance – Confidence Assessment rating of "Satisfactory Confidence." It believes that it has objectively the best Past Performance history, particularly regarding its incumbent SOE TLS effort. In its view then, it should have been rated higher than all the other offerors. By not singling Quantico out for its superior past performance, DLA was able to exclude Quantico from the competition based entirely on Quantico's Technical Merit scores. In other words, if DLA had recognized Quantico's superior past performance and weighted that factor according to the terms of the RFP, Quantico believes that it would have been included in the competitive range. Additionally, Quantico views the agency's reliance on technical subfactors as a discriminator on which to exclude Quantico, as having "diminish[ed] the importance of past performance in the evaluation" contrary to the terms of the solicitation. Quantico's Mot. for J. on the AR 23. Therefore, Quantico concludes that, "[b]y evaluating past performance as it did, DLA rendered Quantico's superior past performance – and really, the Past Performance Factor as a whole – a nullity, making the less-important Technical Merit Factor singularly determinative for purposes of inclusion in the Competitive Range." *Id.*

For any of that to matter, however, Quantico must have had a technically acceptable proposal, which, according to defendant and intervenor, it did not due to the "unacceptable" rating for the Distribution

8

subfactor. This rating would not change, argues the defense, even crediting Quantico's arguments, because [                    ] are left undisturbed by plaintiff's protest.  Per the Source Selection Plan, [

                                                ]  and the proposal unawardable. Thus, in intervenor's and defendant's eyes, plaintiff cannot show any prejudice from the errors alleged regarding its Past Performance or other aspects of its Technical Merit.

      Quantico's response is twofold. First, it argues that DLA's treatment of technical deficiencies as *per se* disqualifying is contrary to FAR part 15 because, in a negotiated procurement, deficiencies and weaknesses are to be discussed by the agency during the period for discussions and clarifications, which had not happened prior to the competitive range determination. Using them as a discriminator in a competitive range determination is thus illegal, according to Quantico. Second, Quantico argues that the weighing of factors by the Contracting Officer ("CO") was contrary to the solicitation, which promised that a best value tradeoff would be performed in which Past Performance would be the most important factor. Thus, the decision to exclude solely based on Quantico's technical deficiencies was arbitrary and capricious because DLA did not follow its own promise to perform a tradeoff in which it weighted past performance more heavily. We disagree.

      For the Technical Merit subfactor (b), Distribution, DLA assigned Quantico's proposal [                                        ] and an overall rating of "Unacceptable." An "unacceptable" proposal is one that "does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance[.]" AR at 46. Even crediting Quantico's arguments with respect to this subfactor, it would only have had [                                ], still resulting in an unacceptable rating.

      [

                    ]. Quantico does not challenge this assessment.  [

            ]. According to its proposal, Quantico stated that "[u]rgent orders will be flagged in our system and shipped the same day via the best method to ensure delivery within seven days," AR at 1482, which is well beyond 72 hours.

      [          ] resulted from Quantico's failure to provide [
                                    ].  According to its proposal, Quantico stated that it would [

9

]. Quantico does not argue that it could meet this requirement.

[

]. We do not reach the merits of this rating, however, because, taken alone, a different result would not change the agency's rating of the proposal as unacceptable and unawardable.

The CO's competitive range determination document thoroughly reviewed the SSEB's ratings for each of the factors and for price. Although it listed several areas for discussion with Quantico for each factor, when it came to the Distribution subfactor, the summary of findings notes that Quantico's proposal was unawardable. AR at 4402. No areas were listed for discussions for the Distribution subfactor.

After exhaustively detailing all of the offerors' proposal ratings by the SSEB, including listing areas for discussions with each offeror, the CO ranked all of the offerors for non-price factors. Quantico was ranked [      ]. *Id.* at 4455-57. The CO then ranked the offerors by lowest to highest evaluated price. Quantico was [   ]. *Id.* at 4458. The CO wrote a narrative description for each offeror's ratings in the order of their non-price ratings. The top six such offerors were included in the competitive range. For Quantico, the CO wrote that, for subfactor (b) [

] *Id.* at 4470. The CO also took note of Quantico's [              ]. She concluded that Quantico was not included in the competitive range because its proposal was not considered a "highly rated proposal." *Id.* She notes that [

].

When considering what the CO did in making the determination and what the solicitation promised, we find no reversible error. The CO concluded that Quantico was not among the most highly rated offerors. This may not have been the most artful explanation, but it is clear that she excluded Quantico due to its inability to meet all of the technical subfactors. No offerors with such a rating were included in the competitive range, which is consistent with the Source Selection Plan's instruction that unacceptable technical factors were unawardable. Nothing alleged by Quantico as error

10

could change that result, even if it were rated higher on Past Performance. When confronted, as here, with almost over [ ] responsive offers, the agency is well within its rights to be selective in setting the competitive range, a determination that is owed a great deal of deference regardless of the number of offerors and is, in any event, a result clearly spelled out in the solicitation and source selection plan.

Quantico had [            ] for the second technical subfactor, any one of which, according the Source Selection Plan, would render the proposal unawardable. Not having challenged [        ], the conclusion is inescapable that the other ratings challenged are immaterial to the outcome. The CO excluded all offerors with unacceptable ratings. Plaintiff would still have such a rating even if we agreed with its allegations of irrationality.

FAR part 15 does not prohibit the CO from using deficiencies as a basis for a competitive range determination. Although plaintiff is correct that the agency is required to discuss weaknesses and deficiencies for any offeror with which it holds discussions, *see* 48 C.F.R. § 15.306(d)(3), that same subpart also requires that agencies make a competitive range determination prior to discussions and that it include in the range only those offerors whose proposal are the "most highly rated." *Id.* § 306(c). Further, subpart 306 assumes that, in doing so, the agency will conduct an evaluation consistent with the solicitation, which, here, is to say that deficiencies in technical proposals would make those proposals unawardable. *See id.* § 306(c)(1) ("agencies shall evaluate all proposals in accordance with 15.305(a), and if discussions are to be conducted, establish a competitive range"). FAR 15.305(a) establishes general guidelines for proposal evaluations, stating that they "may be conducted using any rating method or combination of methods" and that the "relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be document in the contract file." Agencies are required to evaluate proposals consistent with the scheme advertised in the solicitation. *Id.* Thus subpart 306 contemplates, if not requires, agencies taking deficiencies and weaknesses into account in making the competitive range determination. Further, the limited communication with offerors allowed prior to the competitive range determination is prohibited by the FAR from being used as an opportunity to "cure proposal deficiencies" or to otherwise afford an opportunity to revise proposals. *Id.* § 306(b)(2).

FAR part 15 establishes that the steps in a negotiated procurement (competitive range determination and discussions) be taken seriatim and that they be independent of one another. The purpose of the competitive range

11

determination, as made clear in FAR part 15.306, is to winnow the number of offerors with whom discussions are required. That being the case, the former cannot anticipate the latter, otherwise its purpose would be frustrated. Weaknesses and deficiencies are properly considered as part of the competitive range determination. We also find no incompatibility with the solicitation in this regard. Although Past Performance was the most important factor, that weighting did not prevent the agency from treating a technically unacceptable proposal unawardable nor relying on this rubric to set a competitive range. We thus find no irrationality nor illegality in treating the technical ratings in the competitive range determination as the agency did. The conclusion is thus unavoidable that Quantico has not shown prejudice from the alleged evaluation errors. Its rating for the Distribution subfactor would not have improved and its proposal was unawardable. Quantico was thus properly excluded from the competitive range.

      II.     Unifire's Technical Ratings Were Not Arbitrary

As shown in the table above, Unifire received a Factor I, Past Performance – Confidence Assessment rating of "Satisfactory Confidence." Under Factor II, Technical Merit, subfactor (a), Product Sourcing, it received a rating of "Unacceptable," and for subfactor (b), Distribution, it received a rating of "Good." Unifire argues that DLA's flawed evaluation of its proposal under Factor II, subfactor (a), Product Sourcing, kept Unifire out of the competitive range.

Under Technical Merit, subfactor (a), the solicitation identified three components of the Product Sourcing subfactor and instructed offerors to provide a clear explanation as to how the offeror would meet each requirement. The first component related to purchasing system requirements, listing six elements to be addressed. The Solicitation also instructed offerors to provide a plan to meet the quote rate metric. Finally, the Solicitation instructed offerors to describe a plan to meet the fill rate metric and ensure control over subcontracting.[3]

While Unifire received a strength because it "has manufacturers and vendors visit the offeror's location to demonstrate products and provide training on these items to Unifire staff[,]" it received a deficiency because "[t]he information provided in [its] proposal does not constitute a plan as to

---

[3] The quote rate metric requires vendors to submit quotes on 90% of delivery order competitions; whereas, the fill rate metric requires vendors to provide the full quantity for 95% of all lines delivered to be calculated as quantity delivered/quantity ordered.

how the offeror will meet the 95% Fill Rate Performance Metric and ensure control over subcontracting." AR at 3695. As a result, Unifire received an "unacceptable" rating for subfactor (a). Like Quantico, it was thus kept from the competitive range because the unacceptable rating put it outside of the top-rated offerors because none selected for discussions had any ratings lower than "acceptable" and all had prices lower than Unifire's. AR at 4471.

Unifire argues that it did submit a plan to satisfy the solicitation's requirement of a 95% Fill Rate Performance Metric, which was clearly denominated in its proposal as its "Plan to Meet the 95% Fill Rate Performance Metric." Unifire further points out that its proposal for this requirement touted its established relationships with manufacturers of all of the products in the Price Evaluation List and also highlighted its relationship with certain notable non-manufacturer suppliers in its proposal section labeled "Business Alliances and Contractual Relationships," which was directly referenced in the plan to meet the 95% Fill Rate Performance Metric. The import is that the agency ought to have understood that this meant that Unifire could meet the requirement. Moreover, Unifire also avers that its technical proposal, considered as a whole, addresses how it plans to fill orders in detail. The agency ought not have ignored other indicia in its proposal that provided details regarding its ability to meet the fill rate requirements, according to Unifire.

Unifire also argues that another offeror included in the competitive range, [   ], provided a similarly scanty level of detail in its specific response to the Fill Rate requirement and also touted generally its relationship with manufactures and suppliers, but was found to have met the requirement. Thus, in Unifire's view, it, like [   ], ought not to have been assigned a deficiency and booted from the competitive range.

Defendant responds that, unlike [   ], Unifire failed to explain how it would use its business relationships to meet the fill rate metric, reiterating that the SSEB found a general lack of information and narrative regarding the "steps, processes, procedures, methods, etc. that it intends to utilize to meet the Fill Rate Performance Metric and ensure control over subcontracting." AR at 3694. By way of contrast, the government points out that [   ]'s proposal offered a "Vendors Relations" group that would seek "out new manufacturing companies," conduct "market research to proactively meet the future demands," maintain frequent "product training with outside and inside sales representatives," and do "joint sales calls," its "own on base trade shows," and "sales training" with top vendors at its headquarters." AR at 2848.

13

Defendant also contends that the reviewers were not obligated to sift through Unifire's technical proposal to supplement the brief comments unique to the fill rate metric. Indeed, the solicitation warned offerors not to incorporate other sections of their proposal by reference when it stated: **"TO ENSURE THAT YOUR NON-PRICE PROPOSAL IS PROPERLY EVALUATED, PLEASE ARRANGE YOUR REPSONSES IN THE ORDER SHOWN ON THE FOLLOWING PAGES. EACH OF YOUR INDIVIDUAL REPSONSES SHOULD CITE THE APPLICABLE NON-PRICE FACTOR AND PARAGRAPH TO WHICH YOU ARE RESPONDING."** AR at 145. Thus, because information regarding Business Alliances was not found in the section of Unifire's proposal marked "Fill Rate," it could not be considered by the SSEB nor the CO, urges the government.

We need not go so far in accepting the government's larger point that it was not erroneous or arbitrary for the SSEB to evaluate Unifire's proposal with respect to the first technical subfactor in the way that it did. A comparison between Unifire's and [   ]'s proposals regarding this metric reveals that, although both relied on business relationships and took up very similar (limited) space in their proposals, there was a difference in approach in the way the two companies explained their respective abilities to meet the fill rate metric. Unifire touted its existing network of manufacturers and suppliers, but [   ] primarily relied on a plan to continually grow its network, a plan that included certain specific proposed activities. In essence, [   ]'s was prospective while Unifire's was retrospective. The agency chose to credit the forward-looking approach of [   ] and discredit Unifire's plan to rest on its laurels. We find no irrationality therein.

In sum, having a deficiency for the Product Sourcing subfactor, Unifire's rating was properly considered unacceptable and unawardable. The CO found such proposals not among the most highly rated, consistent with FAR 15.306, and excluded Unifire from the competitive range. Plaintiff's other arguments are thus moot because it cannot show prejudice resulting from the alleged errors, and we need not reach them. Unifire's protest must be denied.

## CONCLUSION

Given the lack of success on the merits, we need not reach the other injunctive factors. Both plaintiffs have [                ] deficiencies that rendered their proposals for a technical subfactor unacceptable and unawardable. That fact is dispositive of all the other arguments because the

14

protestors cannot show prejudice resulting from the alleged other errors. Accordingly, the following is ordered:

    1. Plaintiffs' motions for judgment on the administrative record (ECF Nos. 72 and 73) are denied.

    2. Defendant's and intervenor's cross-motions for judgment on the administrative record (ECF Nos. 76, 77, and 78) are granted.

    3. The Clerk of Court is thus directed to enter judgment for defendant, dismissing the complaints in case numbers 20-120C and 20-150C. No costs.

                                      s/ Eric G. Bruggink
                                      ERIC G. BRUGGINK
                                      Senior Judge